UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                        Case No. 18-20220
                        HON. GERSHWIN A. DRAIN

vs.

DJUAN BARNES,

    Defendant.

_____/

## AMENDED OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [#16]

### I. INTRODUCTION

On April 3, 2018, Defendant Djuan Barnes was charged with three counts of mail theft in violation of 18 U.S.C. § 1708. Presently before the Court is Defendant's Motion to Suppress Evidence. This matter is fully briefed and a hearing was held on August 22, 2018. At the hearing, Bloomfield Township Police Officers Jim Moschel, Timothy Newsome and Edward Ryan testified. Sarah O'Neil, General Manager of the Woodspring Suites Hotel, also provided testimony. Based upon the evidence presented at the hearing, the parties' briefing and the relevant authority, the Court will deny the Defendant's Motion to Suppress Evidence.

## II.  FACTUAL BACKGROUND

In late January 2018, Detective Moschel began investigating a series of mail thefts that had recently occurred in Bloomfield Township. His investigation identified Defendant as the suspect for these crimes. Police began surveillance of Defendant who was driving a grey Dodge Journey. They witnessed Defendant drive up to homes and stop at the mailboxes and move on. They also noted that he was staying at the Woodspring Suites Hotel and would travel back to the hotel after his thefts from residents' mailboxes. On February 5, 2018, officers were able to place a tracking device on his vehicle. During their surveillance, police discovered the Dodge Journey was stolen.

On February 12, 2018, police observed the Defendant stop at multiple mailboxes. At this point, Moschel's superior decided that it was in the best interest of the community to cease surveillance and arrest Defendant to prevent further thefts. Around 5:00 p.m. that day, Defendant proceeded to a Walmart Store that was located close to the hotel. He was arrested for possession of a stolen vehicle. The officers conducted a search of the vehicle and found a small amount of stolen mail inside. Due to the numerous thefts witnessed by officers and Defendant's pattern of returning to the hotel after such sprees, Moschel concluded that additional stolen mail would be located in Defendant's hotel room.

Moschel therefore sent Officer Newsome to secure the hotel. He and another officer went to the hotel and spoke with the hotel staff. Newsome explained that Defendant had been arrested and the officers needed to secure his room to get a search warrant. Newsome and his partner conducted a roughly twenty-second sweep of the room to ensure nobody remained inside. Because they only searched the premises to confirm other persons could not destroy any evidence, they did not search inside drawers or any other places where it would be possible for a person to be found hiding. Prior to leaving, Newsome placed police evidence tape on the door.

Meanwhile, Defendant's girlfriend, Emily Clarke, along with her infant child, arrived at the arrest site. Clarke spoke with officers and willingly agreed to go to the station for questioning. While at the station, Clarke requested that she be allowed to go to the hotel room to retrieve personal items. Officer Ryan arrived for his shift at 6:00 p.m. and escorted Clarke back to the hotel. Clarke did not have a key to the room because she was not a registered guest. Officer Ryan spoke with a Woodspring Suites employee and indicated that Clarke had been staying at the hotel with Defendant, the registered guest. Because Defendant had been arrested, Clarke needed access to the room to retrieve her personal belongings. The hotel clerk refused to let Ryan or Clarke enter the room until she had received permission from management.

She contacted Sarah O'Neil, the hotel's General Manager, and explained the situation. O'Neil told the clerk to prevent entry into the room until O'Neil arrived at the hotel. Once O'Neil got to the hotel, she escorted Ryan and Clarke to the room. Officer Ryan informed Clarke that if she wanted to enter the room, he was required to be in the room as well. Once inside, Ryan instructed O'Neil to place every item she wished to take with her on the bed and he took photographs to keep a record of the room's original contents. Ryan did not search the room. After Clarke had collected all of her belongings, Ryan reapplied the evidence tape on the door. He helped Clarke carry her belongings to the car. Other than what he recorded in a written report concerning the items taken by Clark, Ryan did not speak with any other officers about his entry into the room and he had no further involvement with Defendant's case.

Once Ryan and Clarke exited the room, O'Neil performed a "lock-out" procedure with a key that she alone had access to. In O'Neil's view, even though she did not know why Defendant had been arrested, his arrest caused him to be in violation of hotel policy. Woodspring Suites' policy requires guests to "comply with all federal, state and local laws . . . ." Gov.'s Ex. A. This policy, which Defendant signed and acknowledged upon registering for his room, permits hotel staff to ask guests to leave the premises for non-compliance with the hotel's policy. *Id.* O'Neil testified that once she performed the "lock-out" procedure, she

was the only person who could access the room. She also explained that if Defendant had returned that night, she would not have permitted him to stay in his room even though he had paid for the room through 11:00 a.m. the following morning.

Early in the morning on February 13, 2018, Moschel called the hotel and spoke with O'Neil. He asked about the hotel's policies concerning a guest's failure to renew his room by the hotel's checkout time. O'Neil explained that Defendant had been paying on a daily basis each morning to rent his room for another day beginning on February 8, 2018 through February 12, 2018. O'Neil indicated that he had not renewed his room for the night of the 13th and if he did not do so by 11:00 a.m., hotel policy dictated that his key card be deactivated to preclude further access to the room. Hotel policy also required staff to dispose of all of his belongings. Items would then be thrown out in the dumpster behind the hotel so that the room could be rented to another guest.

Later that day, Moschel and other officers returned to the hotel to confirm the room had not been renewed for another night. Because it was past 11:00 a.m. and the room had not been renewed, O'Neil indicated that the hotel staff was preparing to dispose of Defendant's property in the room. The officers asked O'Neil if they could search the room before the property was removed and she said that they could and she escorted them to the room. Inside, officers found

numerous pieces of mail scattered in various places throughout the room. None of the mail was addressed to the Defendant and some of the mail was addressed to victims who had previously reported their mail was stolen. There were also checkbooks, bank statements, financial documents, insurance documents, and other papers that were not addressed to the Defendant. Some of these documents were likewise addressed to persons who had previously reported their mail had been stolen. Officers seized these items, along with a laptop and portable hard drive.

## II. LAW AND ANALYSIS

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Police officers are generally required to obtain a warrant before searching and seizing "persons, houses, papers and effects[.]" *Id. United States v. Killebrew*, 560 F.2d 729, 733 (6th Cir. 1977). The protections of the Fourth Amendment extend to hotel rooms. *Stoner v. California*, 376 U.S. 483, 486 (1964); *United States v. Riley*, 858 F.3d 1012, 1018 (6th Cir. 2017).

In his present motion, Defendant argues that his Fourth Amendment rights were violated when Officers Newsome and Ryan searched his hotel room on February 12, 2018, and when Moschel and other officers searched his room on February 13, 2018. The Government counters that Newsome did not violate the

Fourth Amendment because Newsome was entitled to perform a protective sweep of the premises to ensure there were no persons in the room who could destroy evidence. The Government also argues that Clarke gave Ryan consent to enter the premises, and in any event, Ryan did not conduct a search of the room and none of the photographs taken are to be used at Defendant's trial. Lastly, the Government asserts that Defendant had no legitimate expectation of privacy in his hotel room because the hotel's manager terminated his occupancy and was authorized to give consent for the search.

### A. February 13, 2018 Search

Relying on *Abel v. United States*, 362 U.S. 217 (1960), Defendant argues that he did not "voluntarily relinquish" his interest in the property that was searched. However, the Sixth Circuit, as well as other circuits have repeatedly held that "[o]nce a hotel guest's rental period has expired or been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room or in any article therein of which the hotel lawfully takes possession." *United States v. Allen,* 106 F.3d 695, 699 (6th Cir. 1997) (internal quotation marks omitted) (citing *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987); *United States v. Huffhines*, 967 F.2d 314, 318 (9th Cir. 1992)); *see also United States v. Parizo*, 514 F.2d 52, (2d Cir. 1974) ("[W]hen the term of a guest's occupancy of a room expires, the guest loses his exclusive right to privacy in the room."); *United*

*States v. Croft*, 429 F.2d 884, 887 (10th Cir. 1970) ("When the rental period has elapsed, the guest has completely lost his right to use the room and any privacy associated with it.").

"A hotel terminates a guest's occupancy by taking 'justifiable affirmative steps to repossess a room . . . and to assert dominion and control over it,' even if, for some reason, it is unsuccessful in keeping the guest out of the room." *United States v. Spicer*, 549 F. App'x 373, 376 (6th Cir. Dec. 11, 2013) (quoting *United States v. Cunag*, 386 F.3d 888, 890, 895 (9th Cir. 2004)).

The Court notes that in support of his motion, Defendant relies on authority that is factually dissimilar from the circumstances herein. Defendant's cases do not involve expiration of the rental period or termination of occupancy in connection with a hotel room rental, thus they have no relevance to the legal issue before this Court. *See United States v. Eden*, 190 F. App'x 416 (6th Cir. Jun. 22, 2006) (determining that the defendant had not abandoned her privacy interest in a suitcase located in the trunk of a rental car); *United States v. Basinski*, 226 F.3d 829 (7th Cir. 2000) (affirming suppression of evidence seized from a suitcase that defendant's friend was storing in a barn); *see Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 855 (6th Cir. 2012) (entry into a home without a warrant or consent); *United States v. Chamblis*, 425 F. Supp. 1330, 1335 (E.D. Mich. 1977) (finding officer had no probable cause for further detention which caused the defendant to

flee and discard heroin); *United States v. Eastman*, 645 F. App'x 476, 479 (6th Cir. May 18, 2016) (finding that the defendant had "disclaimed any connection" to the hotel room where he had been apprehended, thus he had no expectation of privacy in the room).

In the instant case, the hotel arguably took steps to take possession of, and terminate Defendant's privacy interests when O'Neil performed the "lock-out" procedure on the evening of February 12, 2018. She testified that at that point no one could access the room and that had Defendant returned to the hotel, she would not have allowed him to remain through the duration of his rental period.

In *Allen*, the defendant paid for "one night's lodging, plus a $20.00 deposit for any telephone charges he might incur." *Allen*, 106 F.3d at 697. The next day, the defendant paid for an additional night, but failed to make a deposit for potential telephone charges. *Id*. That afternoon, a motel clerk realized that the defendant's phone charges had decreased his credit balance to an amount insufficient to pay for the additional night's stay. *Id*. The clerk phoned the defendant, and he indicated he would pay the outstanding amount shortly. *Id*. An hour went by with no payment so the clerk again called the defendant, however he received no answer. *Id*. The motel manager was then informed of the situation. *Id*.

The manager went to the defendant's room and knocked on the door, but there was no answer. *Id*. The manager believed that the defendant had left without

paying so she entered his room to verify her suspicions. *Id.* When she entered the room, she discovered a large amount of marijuana. *Id.* She left the room and engaged a deadbolt lock that only she could open. *Id*. She contacted police who searched the room. *Id.* The *Allen* defendant was charged with various drug trafficking charges and moved to suppress the evidence, but the district court declined to suppress the evidence. *Id*. at 698.

On appeal, the Sixth Circuit rejected the *Allen* defendant's assertion that his motel room was subjected to an unconstitutional search. *Id*. at 699. The *Allen* court held that "[u]pon learning that Allen was keeping contraband with the motel, the motel manager locked Allen out of his room" thereby "divest[ing] Allen of his status as an occupant of the room, and concomitantly terminat[ing] his privacy interests in its contents." *Id.* The *Allen* court further held that:

> Once the manager, through private action, took possession of the motel room, Allen could no longer assert a legitimate privacy interest in its contents. The manager's consent to the officers' search of the room was all that was required.

*Id.* Additionally, the hotel manager's termination of the defendant's rental period was lawful, a requirement for valid consent. *Id*. The *Allen* court relied on the fact that the defendant used the room for illegal activities, as well as failed to pay the room rent when due, despite the clerk's request that he pay the outstanding amount. *Id.*

10

Here, O'Neil took possession of Defendant's hotel room when she performed the "lock-out" procedure. She did so because she believed that Defendant had violated hotel policy requiring that he abide by local, state and federal laws. Yet, it remains an open question whether O'Neil lawfully terminated Defendant's rental period at this point. She testified that she had no details concerning his arrest. As such, she did not know whether his arrest was for conduct that occurred prior to his stay. Likewise, she did not know whether he was conducting illegal activities and using the hotel in furtherance of such activities. Courts have held that termination under such circumstances generally entails using the hotel room to facilitate illicit activity. *See id*. (concluding that tenancy was properly terminated because the defendant was storing illegal drugs on the premises); *Spicer*, 549 F. App'x at 376 (holding that "[a] hotel may lawfully terminate a guest's occupancy for unauthorized activity, including possession of illegal drugs."), *see also United States v. Lanier*, 636 F.3d 228, 233 (6th Cir. 2011) (concluding a hotel was "eminently reasonable" to terminate occupancy when it "discovers the guest has been using the room to peddle drugs.").

Because O'Neil was without sufficient information concerning the facts supporting Defendant's arrest, the Court cannot conclude as a matter of law that Defendant's privacy interests were lawfully terminated on the evening of February 12, 2018. *See United States v. Bass*, 41 F. App'x 735, 737-38 (6th Cir. Jun. 24,

11

2002) (concluding that "[a]lthough the hotel manager testified that he personally considered [the defendant] evicted once he had been arrested, the manager's personal beliefs have no legal import."); *see also Stoner*, 376 U.S. at 490 (noting that the "constitutional protection against unreasonable searches and seizures . . . would disappear if it were left to depend upon the unfettered discretion of an employee of the hotel."). However, because there is a separate and lawful reason for terminating his occupancy—failure to pay rent past the 11:00 a.m. checkout time on February 13, 2018—the Court finds no constitutional infirmity with respect to the search at issue herein.

Defendant of course maintains that he cannot be held to have relinquished his expectation of privacy for failing to pay rent for another night because he had been arrested and could not renew his room. Yet, Defendant again ignores well settled authority that when an individual is arrested and, because of that arrest, the individual is unable to renew his rental period, the individual still relinquishes an expectation of privacy in the room and the contents therein. *See Huffhines*, 967 F.2d at 318-19. In *Huffhines*, the defendant was arrested after providing a false name to a police officer. *Id.* at 316. At the time of his arrest, the defendant had lawfully rented a hotel room, and was due to check out by noon. *Id*. The police went to the hotel after the checkout period without a search warrant and hotel

management gave the officers permission to search the room. *Id*. The police found two plastic bags containing cocaine during the search. *Id*.

The *Huffhines* court rejected the defendant's claim that "he continued to have an expectation of privacy in the room after the rental period expired because his arrest prevented him from returning to the motel to renew the rental agreement." *Id.* at 318. The court held that "it was [the defendant]'s own conduct in giving a false name . . . that precipitated his arrest and prevented" his return to renew his room rental. *Id*. As such, the defendant could not "rely on his own misconduct to extend the period of his expectation of privacy in the motel room. *Id*. (citing *Croft*, 429 F.2d at 887; *United States v. Reyes*, 908 F.2d 281, 285 (8th Cir. 1990)); *see also United States v. Gonzales*, No. 94-1116, 1995 U.S. App. LEXIS 2480, *7 (6th Cir. Feb. 7, 1995) (holding that the fact the defendant had been arrested and thereby prevented from renewing his room rental was of no significance) (citing *United States v. Ramirez*, 810 F.2d 1338, 1341 n.3 (5th Cir. 1987); *United States v. Reyes*, 908 F.2d 281, 285 (8th Cir. 1990)).

The facts here demonstrate that Defendant lost his privacy interest in his room and its contents when he failed to renew his room for an additional night. He cannot rely on his own misconduct—driving a stolen vehicle—which lead to his arrest and prevented the timely renewal of his room rental. Additionally, the hotel had taken affirmative steps to take possession of his room at the point Moschel and

13

the other officers arrived after 11:00 a.m. on February 13, 2018. O'Neil testified that once a guest fails to renew his rental period by checkout time at 11:00 a.m., his key card is deactivated and he no longer may access the room. Moreover, when Moschel approached O'Neil, she confirmed that Defendant had not renewed his room and that staff was preparing to discard his personal property left in the room so that it could be rented to another guest. O'Neil, as the hotel's General Manager, had authority to consent to the search of his room. *Spicer*, 549 F. App'x at 376 ("Once the guest's tenancy is terminated, a hotel employee with hotel given-authority may consent to a search of the guest's former room.") (citing *Allen*, 106 F.3d at 699).

This case is unlike *Bass, supra*, where the Sixth Circuit found that "[i]t was objectively unreasonable . . . for the police officers to rely on the hotel manager's consent in searching a tenant's room." 41 F. App'x at 738. In *Bass*, the hotel valet noticed drugs and a weapon in the defendant's vehicle. *Id*. at 736. When the defendant left the hotel, the night security guard contacted police. *Id*. Upon his return, officers arrested the defendant for carrying a concealed weapon. *Id*. The hotel manager asked the officers to check that the defendant's room was safe. *Id*. Despite having no warrant, the officers agreed to the manager's request. *Id*. The officers found no individuals in the room, but did find a duffel bag containing papers which lead to the defendant's indictment for fraud. *Id*. at 736-37.

14

The *Bass* court concluded that it was objectively unreasonable for the officers to rely on the hotel manager's consent to search the room because there was no "evidence that the hotel management had decided to evict him at the time of the search." *Id.* at 737. Relying on the fact that the manager never told the officers he had evicted the defendant from the hotel, "the police officers could not reasonably rely on the hotel manager's consent in entering [the defendant]'s hotel room." *Id*. at 738. Here, it was objectively reasonable for Moschel to rely on O'Neil's statement that Defendant had not renewed his room rental and hotel policy required that his room key be deactivated. She further indicated that the staff was preparing to discard his personal belongings. This was sufficient for the police to reasonably conclude that Defendant's occupancy had been terminated for failure to timely renew, that the hotel had taken steps to repossess the room and O'Neil had the authority to consent to the search.

In any event, the officers would have inevitably discovered and seized Defendant's personal belongings even if Defendant's occupancy had not been terminated and O'Neil lacked authority to consent to a search of his room. O'Neil testified that once a guest failed to pay by the checkout time, the hotel discarded all of the personal belongings in the dumpster behind the hotel. "[T]he inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that

inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995). Because the Government has shown they would have inevitably discovered the stolen mail and other documents once they were discarded by the hotel, the exclusionary rule is inapplicable to the circumstances before the Court.

    **B.    February 12, 2018 Searches**

        **1.    Officer Newsome's Search**

As to the February 12, 2018 searches, the Court likewise finds no justification for suppressing the evidence seized the following day based upon the *de minimus* searches conducted by Newsome and Ryan. The exclusionary rule only "bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008). Officer Newsome's limited entry into the room immediately following Defendant's arrest had no impact on any subsequent police action. Due to their surveillance of Defendant during the preceding days, Moschel and his team had probable cause to believe that additional evidence of mail fraud was located in Defendant's hotel room. Officer Newsome conducted a roughly twenty-second search to ensure that there were no individuals present who could destroy that evidence. He did not search in any drawers or any spaces where it would be

impossible for a person to hide. Such a search is lawful as a limited protective sweep. *See United States v. Biggs*, 70 F.3d 913, 915 (6th Cir. 1995) (concluding protective sweep of hotel room lawful following defendant's arrest in parking lot of hotel).

Further, Newsome testified that he had no specific recollection of the contents of the room and, in particular, the credenza, which contained some of the stolen mail stacked on top of it. Newsome also testified that he did not speak with any other officers about his search of the room. Suppression of evidence based on this limited, protective sweep that had no derivative impact on any subsequent police action is unwarranted.

### 2. Officer Ryan's Search

Similarly, Officer Ryan's later search on February 12, 2018 had no impact on any subsequent police action. Ryan likewise testified that he had no specific recollection of the contents of the room. He did not conduct a search of the room and did not discuss what he observed in the room to any other officers in the department. It was constitutionally permissible for Ryan to enter the room along with Clarke when she returned to retrieve some personal belongings. *See Illinois v. McArthur*, 531 U.S. 326, 332 (2001) (holding that when law enforcement has probable cause to believe that a place contains evidence of a crime, and reason to

fear that allowing a person entry to that place would lead to the destruction of evidence, they may accompany the person who goes inside to get her belongings).

Additionally, this was Ryan's only involvement with Defendant's case and his report solely identified the items removed by Clarke. His report does not mention any observation of mail in the room, or any of the other documents seized during the February 13, 2018 search. Lastly, the Government does not intend to introduce Ryan's photographs which depict the personal items Clarke took from the room. There is likewise no constitutional infirmity with respect to Ryan's search during the evening of February 12, 2018.

### III. CONCLUSION

Accordingly, for the reasons articulated above, Defendant's Motion to Suppress [#16] is DENIED.

SO ORDERED.

Dated: September 7, 2018   /s/Gershwin A. Drain
   GERSHWIN A. DRAIN
   United States District Judge

### CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 7, 2018, by electronic and/or ordinary mail.
/s/ La Shawn R. Saulsberry for Tanya Bankston
Case Manager